Francis J. "Casey" Flynn, Jr., #304712
**LAW OFFICE OF FRANCIS J. FLYNN, JR.**
6057 Metropolitan Plz
Los Angeles, CA 90036
Tele: 314-662-2836
Email: casey@lawofficeflynn.com

**COUNSEL for PLAINTIFFS**

[Additional Counsel Listed Below]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BRIAN TAYLOR, derivatively on behalf of MOLINA HEALTHCARE, INC.,<br><br>Plaintiff,<br>v.<br><br>DALE WOLF, BARBARA BRASIER, STEPHEN LOCKHART, STEVEN ORLANDO, RONNA ROMNEY, RICHARD SCHAPIRO, RICHARD ZORETIC, LEO GROHOWSKI, JOSEPH ZUBRETSKY, and MARK KEIM,<br><br>Defendants,<br><br>and<br><br>MOLINA HEALTHCARE, INC.,<br><br>Nominal Defendant. | Case No.: 2:25-cv-11769-SPG-RAOx<br><br>**JURY TRIAL DEMANDED**<br><br>**AMENDED[1] VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR DAMAGES FOR:**<br><br>**(1) Breach of Fiduciary Duty (Derivatively Against the Director Defendants)**<br>**(2) Breach of Fiduciary Duty (Derivatively Against the Officer Defendants)**<br>**(3) Gross Mismanagement (Derivatively Against All Defendants)**<br>**(4) Waste of Corporate Assets (Derivatively Against All Defendants)**<br>**(5) Unjust Enrichment (Derivatively Against the Officer Defendants)** |

[1] This Amended Pleading is filed pursuant to Rule 15(a) by way of an agreement of the parties dated May 29, 2026.

| | |
|---|---|
| | **(6) Violations of Section 14(a) of the Exchange Act (Derivatively Against the Director Defendants)** |

Plaintiff Brian Taylor ("Plaintiff"), derivatively on behalf of Molina Healthcare, Inc. ("Molina" or the "Company"), brings the following amended complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violation of Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *Hindelmann v. Molina Healthcare, Inc.et al*, Case No.: 2:25-cv-09461 (C.D. Cal.) (the "Securities Class Action"); (iii) corporate governance documents available on the Company's website; (iv) media reports; and (v) other publicly available information.

## NATURE OF THE ACTION

1. This is a stockholder derivative action brought by Plaintiff, a stockholder of Molina, on behalf of the Company against the Defendants. This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least February 5, 2025, to July 23, 2025 (the "Relevant Time Period"). During that time the Defendants (as defined herein) caused or allowed Molina to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.

2. Molina provides healthcare services to low-income individuals under the Medicaid and Medicare programs and through the state insurance marketplaces.

3. On July 7, 2025, Molina issued a press release announcing financial results for the second quarter and slashing full-year 2025 adjusted earnings per share

guidance. The press release stated that the Company's adjusted earnings were "below prior expectations" due to "medical cost pressures in all three lines of business. The press release revealed that Molina was experiencing a "short-term earnings pressure" from a "dislocation between premium rates and medical cost trend which has recently accelerated."

4. On July 23, 2025, Molina issued a press release reporting final results for the second quarter ended June 30, 2025, and further slashing the Company's full-year 2025 earnings guidance. The Company attributed its results to a "challenging medical cost trend environment," including more "utilization of behavioral health, pharmacy, and inpatient and outpatient services."

5. On the news set forth in the Company's July 7, 2025, press release, Molina's stock price fell $6.97, or 2.9%, to close at $232.61 per share on July 7, 2025.

6. On the news set forth in the Company's July 23, 2025, press release, Molina's stock price fell $32.03, or 16.84%, to close at $158.22 per share on July 24, 2025.

7. Through this action, Plaintiff seeks to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements, as well as the inadequate internal controls that allowed the misconduct to occur, in breach of their fiduciary duties to the Company.

## PARTIES

### A. Plaintiff

8. Plaintiff is a current shareholder of Molina and has continuously held Molina stock during all times relevant hereto and is committed to retaining Molina shares through the pendency of this action to preserve his standing. Plaintiff will adequately and fairly represent the interests of Molina and its shareholders in enforcing its rights.

**B. Nominal Defendant**

9. Nominal Defendant Molina is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 200 Oceangate, Suite 100, Long Beach, CA 90802. Molina common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "MOH."

**C. Individual Defendants**

10. Defendant Joseph M. Zubretsky has served as President, CEO and a director of the Company since 2017.

11. Defendant Dale B. Wolf has been a director of the Company since 2013 and has served as Chairman of the Board since 2017.

12. Defendant Barbara L. Braiser has been a director of the Company since 2019.

13. Defendant Dr. Stephen H. Lockhart has been a director of the Company since 2021.

14. Defendant Stephen J. Orlando has been a director of the Company since 2005.

15. Defendant Ronna E. Romney has been a director of the Company since 2003 and has served as Vice-chair of the Board since 2017.

16. Defendant Richard M. Schapiro has been a director of the Company since 2015.

17. Defendant Richard C. Zoretic has been a director of the Company since 2018.

18. Defendant Leo P. Grohowski has been a director of the Company since 2025.

19. Defendants Zubretsky, Wolf, Brasier, Lockhart, Orlando, Romney, Schapiro, Zoretic, and Grohowski are herein referred to as "Director Defendants."

20. Defendant Mark L. Keim has served as CFO of the Company since 2021.

21. Defendants Zubretsky and Keim are herein referred to as "Officer Defendants."

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

23. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

25. Venue is proper in this court under 28 U.S.C. § 1391, because Molina is headquartered in this District, and a significant amount of the conduct at issue took place and had an effect in this District.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A. Company Background

26. Molina provides healthcare services to low-income individuals under the Medicaid and Medicare programs and through the state insurance marketplaces. As of June 30, 2025, it serves approximately 5.7 million members eligible for government-sponsored healthcare programs, located across 22 states. It operates in four segments: Medicaid, Medicare, Marketplace, and Other.

### B. Molina's False and Misleading Statements

27. On February 5, 2025, Molina issued a press release reporting its financial results for the fourth quarter and year ended December 31, 2024, and the Company's full-year 2025 revenue and earnings guidance. The press release touted the Company's financial results and purported full year revenue guidance as follows in relevant part:

**Molina Healthcare Reports Fourth Quarter and Year-End 2024 Financial Results**

*Introduces Full Year 2025 Revenue and Earnings Guidance*

**Long Beach, Calif, February 5, 2025** – Molina Healthcare, Inc. (NYSE: MOH) (the "Company") today reported fourth quarter 2024 GAAP earnings per diluted share of $4.44 and adjusted earnings per diluted share of $5.05. The Company also reported full year 2024 GAAP earnings per diluted share of $20.42 and adjusted earnings per diluted share of $22.65. Financial results are summarized below:

| | Three months ended December 31, | | Year ended December 31, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| *(In millions, except per-share results)* | | | | |
| Premium Revenue | $9,983 | $8,362 | $38,627 | $32,529 |
| Total Revenue | $10,499 | $9,048 | $40,650 | $34,072 |
| **GAAP:** | | | | |
| Net Income | $251 | $216 | $1,179 | $1,091 |
| EPS – Diluted | $4.44 | $3.70 | $20.42 | $18.77 |
| Medical Care Ratio (MCR) | 90.2 % | 89.1 % | 89.1 % | 88.1 % |
| G&A Ratio | 6.3 % | 7.1 % | 6.7 % | 7.2 % |
| After-tax Margin | 2.4 % | 2.4 % | 2.9 % | 3.2 % |
| **Adjusted:** | | | | |
| Net Income | $286 | $255 | $1,308 | $1,213 |
| EPS – Diluted | $5.05 | $4.38 | $22.65 | $20.88 |
| G&A Ratio | 6.3 % | 7.0 % | 6.7 % | 7.2 % |
| After-tax Margin | 2.7 % | 2.8 % | 3.2 % | 3.6 % |

*See the Reconciliation of Unaudited Non-GAAP Financial Measures at the end of this release.*

**Full Year Highlights**

- As of December 31, 2024, the Company served approximately 5.5 million members.

- Premium revenue was approximately $38.6 billion for the full year 2024, an increase of 19% year over year.

- GAAP net income was $20.42 per diluted share for the full year 2024, an increase of 9% year over year.

- Adjusted net income was $22.65 per diluted share for the full year 2024, an increase of 8% year over year.

- The Company issued its full year 2025 earnings guidance with expected premium revenue of approximately $42 billion and adjusted earnings of at least $24.50 per diluted share, which includes approximately $1.00 per diluted share of implementation costs for recent Medicaid and Medicare Duals contract wins scheduled to commence in 2026 and yields approximately 13% growth over 2024.

- New store embedded earnings is now at $7.75 per diluted share and reflects recent Medicaid and Medicare Duals contract wins.

“I am very pleased our 2024 revenue growth exceeded our long-term targets and we produced consolidated pre-tax margins within our long-term target range,” said Joseph Zubretsky, President and Chief Executive Officer. “Our earnings growth profile is solid heading into 2025, and we continue to execute on the long-term growth opportunities within all of our businesses. We remain confident in our ability to achieve our long-term financial targets.”

* * *

**Medical Care Ratio (MCR)**

- The consolidated MCR for the full year 2024 was 89.1% and reflects continued focus on managing medical costs and a well-balanced portfolio of businesses.

- The Medicaid MCR for the full year 2024 was 90.3%. Within that result, approximately 30 basis points were due to Medicaid “new store” plans, which have continued to improve in line with the Company’s expectations, and approximately 20 basis points were due to a premium rate reduction retroactive to 2023. Excluding the new stores and retroactive premium adjustment, the Medicaid MCR was approximately 89.8%, which is higher than the Company’s long-term expectations and primarily due to the impact of redetermination-related acuity shifts and higher utilization that occurred during the second half of 2024.

- The Medicare MCR for the full year 2024 was 89.1%, which primarily reflects higher-than-expected utilization, partially offset by benefit adjustments implemented for 2024.

- The Marketplace MCR for the full year 2024 was 75.4%, better than the Company’s expectations, reflecting strong operating performance

* * *

**2025 Guidance**

Premium revenue for the full year is expected to be approximately $42 billion, an increase of approximately 9% from the full year 2024.

***The Company expects its full year GAAP earnings per share in 2025 to be at least $22.50 per share and its full year adjusted earnings per share in 2025 to be at least $24.50 per share, representing 8% growth over the full year 2024.*** This increase primarily reflects growth in the Company's legacy footprint and continued realization of new store embedded earnings, partially offset by approximately $1.00 per diluted share of expected implementation costs in 2025 for recent Medicaid and Medicare Duals contract wins, and yields approximately 13% growth over 2024.

Guidance metrics are summarized below:

| Full Year 2025 Guidance | |
|---|---|
| Premium Revenue | $42.0B |
| Total Revenue | $44.0B |
| GAAP Net Income | $1,251M |
| Adjusted Net Income | $1,362M |
| GAAP EPS – Diluted | >$22.50 |
| Adjusted EPS – Diluted | >$24.50 |
| Diluted weighted average shares | 55.6M |
| Year End Total Membership | 5.9M |
| Medicaid | 5.0M |
| Medicare | 250K |
| Marketplace | 580K |
| MCR | 88.7% |
| GAAP G&A Ratio | 7.2% |
| Adjusted G&A Ratio | 7.0% |
| Effective Tax Rate | 25.3% |
| GAAP After-tax Margin | 2.8% |
| Adjusted After-tax Margin | 3.1% |

28. On February 11, 2025, the Company submitted its annual report for the fiscal year ended December 31, 2024, on a Form 10-K filed with the SEC (the "FY24 10-K"). The FY24 10-K affirmed the previously reported financial results, and further reported the alleged results of the Company's change in medical claims and benefits payable for the fiscal year, as follows, in relevant part:

| | Year Ended December 31, 2024 | | | |
|---|---|---|---|---|
| | Medicaid | Medicare | Marketplace | Consolidated |
| | (In millions) | | | |
| Medical claims and benefits payable, beginning balance | $ 3,444 | $ 532 | $ 228 | $ 4,204 |
| Components of medical care costs related to: | | | | |
| Current year | 28,211 | 5,000 | 1,892 | 35,103 |
| Prior years | (611) | (61) | (3) | (675) |
| Total medical care costs | 27,600 | 4,939 | 1,889 | 34,428 |
| Payments for medical care costs related to: | | | | |
| Current year | 24,950 | 4,464 | 1,646 | 31,060 |
| Prior years | 2,258 | 761 | 220 | 3,239 |
| Total paid | 27,208 | 5,225 | 1,866 | 34,299 |
| Acquired balances, net of post-acquisition adjustments | — | 476 | — | 476 |
| Change in non-risk and other provider payables | (169) | — | — | (169) |
| Medical claims and benefits payable, ending balance | $ 3,667 | $ 722 | $ 251 | $ 4,640 |

29. The FY24 10-K reported the Company's key business metrics including the "Basis for Premium Rates" which purportedly "***considers inflation, non-benefit expense requirements, other Medicare Advantage bids submitted to CMS, changes in utilization patterns.***" The FY24 10-K further described the Company's purported "***utilization management***" strategies, which purported to assure investors the Company could provide utilization as well as "***high-quality, affordable care***" and "***mitigate the negative effects of healthcare cost inflation***." Specifically, the FY24 10-K stated as follows, in relevant part:

> **Basis for Premium Rates**
>
> Under Medicare Advantage, managed care plans contract with CMS, and for the dual-eligible programs with CMS and state governments, to provide benefits in exchange for a PMPM premium payment that varies based on health plan Star rating and member demographics, including county of residence and health risk factors. ***The premium payment considers inflation, non-benefit expense requirements, other Medicare Advantage bids submitted to CMS, changes in utilization patterns and average per capita fee-for-service Medicare costs in the calculation of the PMPM premium payment.*** Amounts payable to us under the dual-eligible programs and Medicare Advantage contracts are subject to annual revision by CMS, including any federal budget cuts or tax changes applicable to Medicare. We elect to participate in each Medicare service area or region on an annual basis.
>
> * * *
>
> **Basis for Premium Rates**
>
> For Marketplace, we develop each state's premium rates during the spring of each year for policies effective in the following calendar year.

> ***Premium rates are based on our estimates of utilization of services and unit costs, anticipated member risk acuity and related federal risk adjustment transfer amounts, and non-benefit expenses such as administrative costs, taxes, and fees.*** The premium rates are filed for approval with the various state and federal authorities in accordance with the rules and regulations applicable to the ACA individual market, including, but not limited to, minimum loss ratio thresholds and adjustments for permissible rate variations by age, geographic area, and variations in plan design. In the year ended December 31, 2024, Marketplace program PMPM premium rates ranged from $400 to $1,980.
>
> * * *
>
> **Utilization Management**
>
> Our goal is to optimize access to low-cost, high-quality care. This is achieved by sound clinical policy based on current evidence-based practices. Additionally, we continuously monitor utilization patterns and strive to identify new opportunities to reduce costs and improve quality of care. Our utilization management process serves as a bridge to identify at-risk members for referral into internally developed case management programs such as "Transitions of Care," which facilitates post-discharge safety and appropriate outcomes.
>
> **Population Management**
>
> We believe high-quality, affordable care is achieved through a variety of programs tailored to our members' emerging needs. Individuals are identified for interventions, and programs are customized, based on predictive analytics and our member assessment process. These tools ensure that the appropriate level of services and support are provided to address physical health, behavioral health, and social determinants of health. This comprehensive and customized approach is designed to help members achieve their goals and improve their overall quality of life.
>
> **Pharmacy Management**
>
> Our pharmacy programs are designed to make us a trusted partner in improving member health and healthcare affordability. We strategically partner with physicians and other healthcare providers who treat our members. This collaboration results in drug formularies and clinical initiatives that promote improved patient care. We employ full-time pharmacists and pharmacy technicians who work closely with providers to educate them about our formulary products, clinical programs, and the importance of cost-effective care.
>
> **Medical Cost Management**
>
> We use various strategies to mitigate the negative effects of healthcare cost inflation. Specifically, our health plans use coordination of care programs for our members, product and benefit designs, hospital inpatient management systems, sophisticated analytics, and care

> management programs related to complex chronic conditions, prenatal and premature infant care and certain other conditions. Our health plans emphasize preventive healthcare and appropriate use of specialty and hospital services with their contracted independent providers. There can be no assurance, however, that our strategies to mitigate medical care cost inflation will be successful. Competitive pressures, new healthcare and pharmaceutical product introductions, demands from healthcare providers and customers, applicable regulations, or other factors may affect our ability to control medical care costs.

30. The FY24 10-K further purported to warn of risks which "***may***" or "***could***" negatively impact the Company, including those related to demand, as follows in relevant part:

> ***A failure to accurately estimate incurred but not paid medical care costs may negatively impact our results of operations.*** Because of the lag in time between when medical services are actually rendered by our providers and when we receive, process, and pay a claim for those medical services, we must continually estimate our medical claims liability at particular points in time and establish claims reserves related to such estimates. Our estimated reserves for such incurred but not paid, or IBNP, medical care costs are based on numerous assumptions and inputs. We estimate our medical claims liabilities using actuarial methods based on historical data adjusted for claims receipt and payment experience (and variations in that experience), changes in membership, provider billing practices, healthcare service utilization trends, cost trends, product mix, seasonality, prior authorization of medical services, benefit changes, known incidence of disease, or increased incidence of illness such as the flu or COVID, provider contract changes, changes to Medicaid fee schedules, and the incidence of high dollar or catastrophic claims. Our ability to accurately estimate claims for our newer lines of business or populations is negatively impacted by the more limited experience we have had with those newer lines of business or populations.
>
> * * *
>
> ***If we fail to accurately predict and effectively manage our medical care costs, our operating results could be materially and adversely affected.***
>
> Our profitability depends to a significant degree on our ability to accurately predict and effectively manage our medical care costs. Historically, our medical care ratio, meaning our medical care costs as a percentage of our premium revenue, has fluctuated substantially, and has varied across our health plans. Because the premium payments we receive are generally fixed in advance and we operate with a narrow profit margin, relatively small changes in our medical care ratio can create significant changes in our overall financial results. For example, if our overall medical care ratio of 89.1% for the year ended December 31, 2024, had been one percentage point higher, or 90.1%, our net income per diluted share for the year ended December 31, 2024 would

have been approximately $15.18 rather than our actual net income per diluted share of $20.42, a difference of $5.24.

31. On April 23, 2025, Molina issued a press release reporting its financial results for the first quarter ended March 31, 2025, and reaffirming the Company's full-year 2025 revenue and earnings guidance. The press release touted the Company's financial results and purported full year revenue guidance as follows in relevant part:

**Molina Healthcare Reports First Quarter 2025 Financial Results**

*Reaffirms Full Year 2025 Guidance*

Long Beach, Calif, April 23, 2025 – Molina Healthcare, Inc. (NYSE: MOH) (the "Company") today reported first quarter 2025 GAAP earnings per diluted share of $5.45 and adjusted earnings per diluted share of $6.08. Financial results are summarized below:

| | Three months ended March 31, | |
|---|---|---|
| | 2025 | 2024 |
| *(In millions, except per-share results)* | | |
| Premium Revenue | $10,628 | $9,504 |
| Total Revenue | $11,147 | $9,931 |
| **GAAP:** | | |
| Net Income | $298 | $301 |
| EPS – Diluted | $5.45 | $5.17 |
| Medical Care Ratio (MCR) | 89.2 % | 88.5 % |
| G&A Ratio | 6.9 % | 7.2 % |
| After-tax Margin | 2.7 % | 3.0 % |
| **Adjusted:** | | |
| Net Income | $333 | $334 |
| EPS – Diluted | $6.08 | $5.73 |
| G&A Ratio | 6.8 % | 7.1 % |
| After-tax Margin | 3.0 % | 3.4 % |

**Quarter Highlights**

- As of March 31, 2025, the Company served approximately 5.8 million members, an increase of 25,000 members compared to March 31, 2024.

- Premium revenue was approximately $10.6 billion for the first quarter of 2025, an increase of 12% year over year.

- GAAP net income was $5.45 per diluted share for the first quarter of 2025, an increase of 5% year over year.

- Adjusted net income was $6.08 per diluted share for the first quarter of 2025, an increase of 6% year over year.

- ***The Company reaffirmed its full year 2025 earnings guidance with expected premium revenue of approximately $42 billion and adjusted earnings of at least $24.50 per diluted share.***

- New store embedded earnings are now at $8.65 per diluted share.

"Our first quarter results reflect our team's disciplined approach to medical cost management in an improving rate environment," said Joseph Zubretsky, President and Chief Executive Officer. "Our 2025 earnings and growth profiles are solid, and we remain confident in our ability to achieve our 13% to 15% long-term adjusted EPS growth target."

* * *

**Medical Care Ratio (MCR)**

- The consolidated MCR for the first quarter of 2025 was 89.2% and reflects strong medical cost management.

- The Medicaid MCR for the first quarter of 2025 was 90.3% and in line with the Company's expectations. Medical costs increased moderately as expected due to utilization of long-term services and supports, pharmacy, and behavioral health services, as well as seasonal illnesses. These higher medical costs were offset by the new rate cycle.

- The Medicare MCR for the first quarter of 2025 was 88.3%, and in line with the Company's expectations, reflecting pricing and benefit adjustments implemented for 2025 and the exit from MAPD in thirteen states.

- The Marketplace MCR for the first quarter of 2025 was 81.7%. Within that result, approximately 400 basis points was due to prior year final risk adjustment and member reconciliations and a higher "new store" MCR related to the ConnectiCare acquisition. Excluding these items, the Marketplace MCR was approximately 77.7% and in line with the Company's expectations.

* * *

**2025 Guidance**

***Premium revenue guidance for the full year is unchanged and expected to be approximately $42 billion, an increase of approximately 9% from the full year 2024.***

***The Company expects its full year GAAP earnings in 2025 to be at least $22.32 per share and reaffirms its full year adjusted earnings in 2025 to be at least $24.50 per share, representing 8% growth over the full year 2024.***

32. On April 23, 2025, the Company submitted its quarterly report for the period ended March 31, 2025, on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The report further stated the alleged results of the Company's change in medical claims and benefits payable for the fiscal year, as follows, in relevant part:

| | Three Months Ended March 31, 2025 | | | | |
|---|---|---|---|---|---|
| | Medicaid | Medicare | Marketplace | Other | Consolidated |
| | | | (In millions) | | |
| Medical claims and benefits payable, beginning balance | $ 3,667 | $ 722 | $ 251 | $ — | $ 4,640 |
| Components of medical care costs related to: | | | | | |
| Current year | 7,495 | 1,352 | 795 | 23 | 9,665 |
| Prior years | (156) | (56) | 26 | — | (186) |
| Total medical care costs | 7,339 | 1,296 | 821 | 23 | 9,479 |
| Payments for medical care costs related to: | | | | | |
| Current year | 4,593 | 721 | 458 | 17 | 5,789 |
| Prior years | 2,760 | 623 | 287 | 14 | 3,684 |
| Total paid | 7,353 | 1,344 | 745 | 31 | 9,473 |
| Acquired balances, net of post-acquisition adjustments | — | 122 | 88 | 35 | 245 |
| Change in non-risk and other payables | (87) | — | — | — | (87) |
| Medical claims and benefits payable, ending balance | $ 3,566 | $ 796 | $ 415 | $ 27 | $ 4,804 |

* * *

> ***The favorable prior year development recognized in the three months ended March 31, 2025 was primarily attributable to reserving under moderately adverse conditions, lower than expected utilization of medical services by our members and improved operating performance,*** mainly in the Medicaid segment. Consequently, the ultimate costs recognized in 2025, as claims payments were processed, were lower than our estimates in 2024.

33. The above statements identified in ¶¶ 28-33 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) material, adverse facts concerning the Company's "medical cost trend assumptions;" (2) that Molina was experiencing a "dislocation between premium rates and medical cost trend;" (3) that Molina's near term growth was dependent on a lack of "utilization of behavioral health, pharmacy, and inpatient and outpatient services;" (4) as a result of the foregoing, Molina's financial guidance for fiscal year

2025 was substantially likely to be cut; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**C. The Truth is Revealed**

34. On July 7, 2025, before the market opened, Molina issued a press release announcing financial results for the second quarter of 2025 and slashing full year 2025 adjusted earnings per share guidance. The press release revealed the Company's second quarter 2025 adjusted earnings of approximately $5.50 per share, which was "***below its prior expectations***" due to "***medical cost pressures in all three lines of business***." The Company announced it "expects these medical cost pressures to continue into the second half of the year" and cut guidance for expected adjusted earnings per share 10.2% at the midpoint, from "at least $24.50 per share" to a "range of $21.50 to $22.50 per share." The press release revealed Molina was experiencing a "short-term earnings pressure" from a "***dislocation between premium rates and medical cost trend which has recently accelerated.***" Specifically, the press release stated as follows, in relevant part:

> **Molina Healthcare Announces Preliminary Second Quarter Financial Results and Updates Fiscal Year 2025 Earnings Per Share Guidance**
>
> **Long Beach, Calif., July 7, 2025** – Molina Healthcare, Inc. (NYSE: MOH) today announced preliminary financial results for the second quarter of 2025 and updated its full year 2025 adjusted earnings per share guidance. The Company's announcement of preliminary results was driven by recent market dynamics and off-cycle disclosures from others in the managed health care sector.
>
> The Company now expects its second quarter 2025 adjusted earnings to be approximately $5.50 per share(1), which is modestly below its prior expectations. This preliminary result reflects medical cost pressures in all three lines of business. The Company expects these medical cost pressures to continue into the second half of the year. As a result, the Company now expects its full year 2025 adjusted earnings to be in the range of $21.50 to $22.50 per share (1), reflecting a consolidated pre-tax margin of just under 4%, the low-end of its long-term guidance range.
>
> "The short-term earnings pressure we are experiencing results from

> what we believe to be a temporary dislocation between premium rates and medical cost trend which has recently accelerated," said Joseph Zubretsky, President and Chief Executive Officer. "As we are still performing near our long-term target ranges, nothing, including the potential impacts of the budget bill, has changed our outlook for the longterm performance of the business."
>
> As previously announced, the Company expects to report its full second quarter results after the market closes on Wednesday, July 23, 2025, and will host a conference call and webcast to discuss the earnings release on Thursday, July 24, 2025, at 8:00 a.m. Eastern Time.

35. On this news, Molina's stock price fell $6.97, or 2.9%, to close at $232.61 per share on July 7, 2025, on unusually heavy trading volume.

36. The above statements identified in ¶ 35 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) material, adverse facts concerning the Company's "medical cost trend assumptions;" (2) that Molina's near term growth was dependent on a lack of "utilization of behavioral health, pharmacy, and inpatient and outpatient services;" (3) as a result of the foregoing, Molina's financial guidance for fiscal year 2025 was substantially likely to be cut; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

37. On July 23, 2025, after the market closed, Molina issued a press release reporting its financial results for the second quarter ended June 30, 2025, and further slashing the Company's full-year 2025 earnings guidance. The press release revealed, in part, that the Company's "GAAP net income was $4.75 per diluted share for the second quarter of 2025, a decrease of 8% year over year;" and it "***now expects its full year 2025 adjusted earnings to be no less than $19.00 per diluted share.***" This represented another 13.6% cut to guidance for earnings per share at the midpoint, from the cut to guidance announced less than two weeks earlier. The Company also cut its guidance for its full year 2025 GAAP net income 27% to $912

million. The Company attributed its results a full year outlook to a "challenging medical cost trend environment," including mere "***utilization of behavioral health, pharmacy, and inpatient and outpatient services.***" The Company alleged its guidance cut also reflected "new information gained in the quarterly closing process." Specifically, the press release stated as follows, in relevant part:

**Molina Healthcare Reports Second Quarter 2025 Financial Results**

*Revises Full Year 2025 Guidance*

Long Beach, Calif, July 23, 2025 – Molina Healthcare, Inc. (NYSE: MOH) (the "Company") today reported second quarter 2025 GAAP earnings per diluted share of $4.75 and adjusted earnings per diluted share of $5.48. Financial results are summarized below:

| | Three months ended June 30, | | Six months ended June 30, | |
|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 |
| *(In millions, except per-share results)* | | | | |
| Premium Revenue | $10,868 | $9,446 | $21,496 | $18,950 |
| Total Revenue | $11,427 | $9,880 | $22,574 | $19,811 |
| **GAAP:** | | | | |
| Net Income | $255 | $301 | $553 | $602 |
| EPS – Diluted | $4.75 | $5.17 | $10.19 | $10.33 |
| Medical Care Ratio (MCR) | 90.4 % | 88.6 % | 89.8 % | 88.6 % |
| G&A Ratio | 6.2 % | 7.0 % | 6.6 % | 7.1 % |
| After-tax Margin | 2.2 % | 3.0 % | 2.4 % | 3.0 % |
| **Adjusted:** | | | | |
| Net Income | $294 | $341 | $627 | $675 |
| EPS – Diluted | $5.48 | $5.86 | $11.56 | $11.59 |
| G&A Ratio | 6.1 % | 6.9 % | 6.4 % | 7.0 % |
| After-tax Margin | 2.6 % | 3.5 % | 2.8 % | 3.4 % |

**Quarter Highlights**

- As of June 30, 2025, the Company served approximately 5.7 million members, an increase of 167,000 members compared to June 30, 2024
- Premium revenue was approximately $10.9 billion for the second quarter of 2025, an increase of 15% year over year.
- GAAP net income was $4.75 per diluted share for the second quarter of 2025, a decrease of 8% year over year.
- Adjusted net income was $5.48 per diluted share for the second quarter of 2025, a decrease of 6% year over year.

- ***The Company now expects its full year 2025 adjusted earnings to be no less than $19.00 per diluted share and reaffirms its premium revenue guidance of approximately $42 billion.***
- New store embedded earnings remain at $8.65 per diluted share.
- "Our second quarter results and revised full year outlook reflect a challenging medical cost trend environment," said Joseph Zubretsky, President and Chief Executive Officer. "The current earnings pressure we are experiencing results from what we believe to be a temporary dislocation between premium rates and medical cost trend which has recently accelerated. We are still performing near our long-term target ranges, and nothing has changed our outlook for the long-term performance of the business."

* * *

**2025 Guidance**

Premium revenue guidance for the full year is unchanged and expected to be approximately $42 billion, an increase of approximately 9% from the full year 2024.

The Company now expects its full year 2025 GAAP earnings to be no less than $16.90 per diluted share and its full year 2025 adjusted earnings to be no less than $19.00 per diluted share. The updated guidance, which is disproportionately attributed to Marketplace, reflects new information gained in the quarterly closing process and implications for medical cost trend assumptions for the second half of the year.

Guidance metrics are summarized below:

| Full Year 2025 Guidance | |
|---|---|
| Premium Revenue | $42.0B |
| Total Revenue | $44.0B |
| GAAP Net Income | $912M |
| Adjusted Net Income | $1,028M |
| GAAP EPS – Diluted | ≥ $16.90 |
| Adjusted EPS – Diluted | ≥ $19.00 |
| Diluted weighted average shares | 54.1M |
| MCR | 90.2% |
| Medicaid | 90.9% |
| Medicare | 90.0% |
| Marketplace | 85.1% |
| GAAP G&A Ratio | 6.7% |
| Adjusted G&A Ratio | 6.6% |
| Effective Tax Rate | 25.3% |
| GAAP Pre-tax Margin | 2.8% |
| Adjusted Pre-tax Margin | 3.1% |

On this news, Molina's stock price fell $32.03, or 16.84%, to close at $158.22 per share on July 24, 2025, on unusually heavy trading volume.

**D. Defendants' Misconduct Has and Continues to Harm the Company**

38. As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be harmed. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the Securities Class Action, as well as costs to be incurred in remediating deficiencies in the Company's internal controls.

39. Molina's reputation and goodwill have also been damaged by the Defendants' misconduct.

**E. Molina Issues False and Misleading Proxy Statements**

40. In addition to the false and misleading statements discussed above, the Director Defendants also caused the Company to issue false and misleading proxy statements during the Relevant Period, including the Schedule 14A Proxy Statement issued on March 17, 2025 (the "Proxy"), that sought stockholder votes to, among other things, re-elect or and/or elect the Director Defendants to serve on the Board.

41. The Director Defendants drafted, approved, reviewed, and/or signed the Proxy before it was filed with the SEC and disseminated to Molina's

stockholders. The Director Defendants negligently issued materially misleading statements in the Proxy. These allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the Proxy allegations and related claims.

42. In support of re-electing themselves, the Director Defendants highlighted their supposed oversight of the Company in the Proxy. The Proxy stated:

> **Corporate Governance and Board of Directors Matters**
>
> The Board continually strives to pursue sound corporate governance policies and practices, to maintain high standards of ethical conduct, to report the Company's financial results with accuracy and transparency, and to maintain full compliance with the laws, rules, and regulations that govern the Company's business.
>
> **Board's Role in Risk Oversight**
>
> While management is responsible for designing and implementing the Company's risk management process, controls, and oversight, the Board, both as a whole and through its committees, has overall responsibility for oversight of the Company's risk management. The audit committee is responsible for discussing our policies with respect to risk assessment and risk management, cybersecurity and data security risks, and the Company's financial risk exposures and the manner in which such risks are being monitored and controlled. The compliance committee is responsible for overseeing significant risk areas related to compliance and quality. The compensation committee is responsible for overseeing the management of risks relating to the Company's executive compensation plans and arrangements. The corporate governance and nominating committee manages risks associated with the independence of the Board and with potential conflicts of interest. The finance committee manages risks associated with our capital structure, credit, liquidity and operations. The Board regularly receives reports from senior management with respect to the Company's management of major risks that may affect the Company's ability to execute on its corporate strategy and fulfill its business objectives. The Board's role is to oversee this effort and to consult with management on the effectiveness of risk identification, measurement, monitoring and mitigation processes, and the adequacy of staffing and action plans, as needed. The Company has also instituted a management enterprise risk management committee to assess the risks of the Company. In addition, the compensation committee reviews compensation programs to ensure that they do not encourage unnecessary or excessive risk-taking. The

compensation committee has concluded our compensation programs do not create risks that are reasonably likely to have a material adverse effect on the Company.

43. The Proxy thus assured stockholders that the Director Defendants understood Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements concerning the Company's business, operations and prospects.

44. As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect and elect the Director Defendants to the Board.

**F. The Board Breached its Fiduciary Duties**

45. As officers and/or directors of Molina, the Defendants owed Molina fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Molina in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of Molina, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

46. Defendants, because of their positions of control and authority as directors and/or officers of Molina, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly-traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding Molina's financial condition, performance, growth,

operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

47. To discharge their duties, the officers and directors of Molina were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors and Molina were required to, among other things:

(a) Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

(b) Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(d) Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e) Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f) Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

(g) Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

48. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

49. The Board's Audit Committee is tasked with overseeing Molina's financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of Molina's internal controls over financial reporting and its disclosure controls and procedures. Specifically, according to the Audit Committee's charter, the Audit Committee's responsibilities include:

- Assisting the Company's Board with oversight of, among other things:
    - the integrity of the Company's financial statements;
    - the Company's compliance with legal and regulatory requirements;
    - the Company's independent auditor's qualifications and independence;
    - enterprise risk management;
    - privacy, data security, and cybersecurity matters;
    - the performance of the Company's internal auditor.
- Maintaining, through regularly scheduled meetings, a line of communication between the Board and the Company's management, internal auditor, and independent auditor.
- Preparing the report of the Audit Committee to be included in the Company's annual proxy statements as required by the rules and regulations of the Securities and Exchange Commission.

50. In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants Schapiro, Brasier, Orlando, and Zoretic (the "Audit Committee Defendants") conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

51. In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

52. The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their Audit Committee Charter have inflicted, and will continue to inflict, significant harm on Molina.

## DERIVATIVE ALLEGATIONS

53. Plaintiff brings this action derivatively in the right and for the benefit of Molina to redress injuries suffered by Molina as a direct result of the Director Defendants' breaches of fiduciary duty. Molina is named as a nominal defendant

solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

54. Plaintiff will adequately and fairly represent the interests of Molina in enforcing and prosecuting the Company's rights.

55. Plaintiff was a stockholder of Molina at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a Molina stockholder.

## DEMAND FUTILITY ALLEGATIONS

56. Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

57. The Molina Board currently has nine members: Defendants Wolf, Brasier, Lockhart, Orlando, Romney, Schapiro, Zoretic, Zubretsky, and Grohowski.

58. Plaintiff has not made any demand on Molina's current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

59. The Director Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. In addition, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.

60. The Director Defendants' making or authorization of the false and misleading statements discussed above caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Molina. The

failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence, constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. The Director Defendants could not fairly and fully prosecute this action or any other action concerning the misconduct described above.

**A. Demand is Excused as to Defendant Zubretsky**

61. Defendant Zubretsky is the Company's CEO. Defendant Zubretsky received compensation of $21,944,109 in 2024. Defendant depends on Molina for his income. In addition, Molina stated in the Proxy that Defendant Zubretsky is not independent pursuant to NYSE rules.

62. Defendant Zubretsky served as a director of the Company during the Relevant Time Period. As a director, Defendant Zubretsky had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Zubretsky was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

63. Defendant Zubretsky failed to conduct oversight of the Company's internal controls over financial reporting and the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Molina's controls, Defendant Zubretsky failed to protect corporate assets.

64. Defendant Zubretsky was an active participant in the misconduct described above. Defendant Zubretsky signed the 2024 10-K, as well as the Forms 10-Q filed by the Company during the Relevant Time Period. Defendant Zubretsky

made false and misleading statements concerning the Company's business, operations and prospects. Defendant Zubretsky therefore faces a substantial likelihood of liability.

65. In addition, Defendant Zubretsky is a named defendant in the Securities Class Action.

66. Thus, Defendant Zubretsky faces a substantial likelihood of liability.

**B. Demand is Excused as to Defendant Lockhart**

67. Defendant Lockhart served as a director of the Company during the Relevant Time Period. As a director, Defendant Lockhart had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Lockhart was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

68. Defendant Lockhart failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Molina's controls, Defendant Lockhart failed to protect corporate assets.

69. According to the Proxy, Defendant Lockhart received $357,364 in compensation in connection with his role as a Company director. Defendant Lockhart is not otherwise employed. Accordingly, Defendant Lockhart cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

70. Defendant was an active participant in the misconduct described above. Defendant Lockhart signed the 2024 10-K. Defendant Lockhart therefore faces a substantial likelihood of liability.

**C. Demand is Excused as to Defendant Schapiro**

71. Defendant Schapiro served as a director of the Company during the Relevant Time Period. As a director, Defendant Schapiro had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Schapiro was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

72. Defendant Schapiro failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Molina's controls, Defendant Schapiro failed to protect corporate assets.

73. According to the Proxy, Defendant Schapiro received $382,364 in compensation in connection with his role as a Company director. Accordingly, Defendant Schapiro cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

74. Defendant Schapiro was an active participant in the misconduct described above. Defendant Schapiro signed the 2024 10-K. Defendant Schapiro therefore faces a substantial likelihood of liability.

75. Defendant Schapiro served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for risk oversight and controls in financial reporting. The Audit Committee was thus responsible for reviewing and approving Molina's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Schapiro was thus responsible for knowingly or recklessly allowing the improper statements related to the Company's business, operations and prospects.

**D. Demand is Excused as to Defendant Romney**

76. Defendant Romney served as a director of the Company during the Relevant Time Period. As a director, Defendant Romney had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Romney was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

77. Defendant Romney failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Molina's controls, Defendant Romney failed to protect corporate assets.

78. According to the Proxy, Defendant Romney received $409,864 in compensation in connection with her role as a Company director. Defendant Romney is not otherwise employed. Accordingly, Defendant Romney cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

79. Defendant Romney was an active participant in the misconduct described above. Defendant Romney signed the 2024 10-K. Defendant Romney therefore faces a substantial likelihood of liability.

**E. Demand is Excused as to Defendant Wolf**

80. Defendant Wolf served as a director of the Company during the Relevant Time Period. As a director, Defendant Wolf had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Wolf was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

81. Defendant Wolf failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Molina's controls, Defendant Wolf failed to protect corporate assets.

82. According to the Proxy, Defendant Wolf received $589,864 in compensation in connection with his role as a Company director. Defendant Wolf is not otherwise employed. Accordingly, Defendant Wolf cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

83. Defendant Wolf was an active participant in the misconduct described above. Defendant Wolf signed the 2024 10-K. Defendant Wolf therefore faces a substantial likelihood of liability.

**F. Demand is Excused as to Defendant Brasier**

84. Defendant Brasier served as a director of the Company during the Relevant Time Period. As a director, Defendant Brasier had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Brasier was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

85. Defendant Brasier failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Molina's controls, Defendant Brasier failed to protect corporate assets.

86. According to the Proxy, Defendant Brasier received $372,364 in compensation in connection with her role as a Company director. Defendant Brasier is not otherwise employed. Accordingly, Defendant Brasier cannot reasonably and

objectively consider a demand to sue the Board that controls her continued compensation.

87. Defendant Brasier was an active participant in the misconduct described above. Defendant Brasier signed the 2024 10-K. Defendant Brasier therefore faces a substantial likelihood of liability.

88. Defendant Brasier served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for risk oversight and controls in financial reporting. The Audit Committee was thus responsible for reviewing and approving Molina's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Brasier was thus responsible for knowingly or recklessly allowing the improper statements related to Molina's business, operations and prospects.

**G. Demand is Excused as to Defendant Orlando**

89. Defendant Orlando served as a director of the Company during the Relevant Time Period. As a director, Defendant Orlando had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Orlando was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

90. Defendant Orlando failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Molina's controls, Defendant Orlando failed to protect corporate assets.

91. According to the Proxy, Defendant Orlando received $404,864 in compensation in connection with his role as a Company director. Accordingly, Defendant Orlando cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

92. Defendant Orlando was an active participant in the misconduct described above. Defendant Orlando signed the 2024 10-K. Defendant Orlando therefore faces a substantial likelihood of liability.

93. Defendant Orlando served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for risk oversight and controls in financial reporting. The Audit Committee was thus responsible for reviewing and approving Molina's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Orlando was thus responsible for knowingly or recklessly allowing the improper statements related to the Company's business, operations and prospects.

**H. Demand is Excused as to Defendant Zoretic**

94. Defendant Zoretic served as a director of the Company during the Relevant Time Period. As a director, Defendant Zoretic had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Zoretic was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

95. Defendant Zoretic failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Molina's controls, Defendant Zoretic failed to protect corporate assets.

96. According to the Proxy, Defendant Zoretic received $372,364 in compensation in connection with his role as a Company director. Defendant Zoretic is not otherwise employed. Accordingly, Defendant Zoretic cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

97. Defendant Zoretic was an active participant in the misconduct described above. Defendant Zoretic signed the 2024 10-K. Defendant Zoretic therefore faces a substantial likelihood of liability.

98. Defendant Zoretic served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for risk oversight and controls in financial reporting. The Audit Committee was thus responsible for reviewing and approving Molina's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Zoretic was thus responsible for knowingly or recklessly allowing the improper statements related to the Company's business, operations and prospects.

**I. Demand is Excused as to Defendant Grohowski**

99. Defendant Grohowski served as a director of the Company during the Relevant Time Period, elected at the 2025 annual meeting of stockholders. As a director, Defendant Grohowski had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Grohowski was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

100. Defendant Grohowski failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Molina's controls, Defendant Grohowski failed to protect corporate assets.

101. According to the Proxy, Defendant Grohowski will receive compensation in connection with his role as a Company director. Defendant Grohowski is not otherwise employed. Accordingly, Defendant Grohowski cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

102. Defendant Grohowski was an active participant in the misconduct described above. Defendant Grohowski therefore faces a substantial likelihood of liability.

103. Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (Derivatively Against The Director Defendants)

104. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

105. Each of the Director Defendants owed and owes Molina the highest obligations of loyalty, good faith, due care, and oversight.

106. Each of the Director Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

107. The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

108. In addition, the Director Defendants further breached their fiduciary duties owed to Molina by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose: (1) material, adverse facts concerning the Company's "medical cost trend assumptions; (2) that Molina was

experiencing a "dislocation between premium rates and medical cost trends; (3) that Molina's near-term growth was dependent on lack of "utilization of behavioral, health, pharmacy, and inpatient and outpatient services; (4) that as a result of the foregoing, Molina's financial guidance for fiscal year 2025 was likely to be cut; and therefore, (5) the Company's positive statements about its business, operations and prospects were materially misleading and/or lacked reasonable basis. The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

109. The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

110. As a direct and proximate result of the breaches of duty alleged herein, Molina has sustained and will sustain significant damages.

111. As a result of the misconduct alleged herein, these Defendants are liable to the Company.

112. Plaintiff, on behalf of Molina, has no adequate remedy at law.

**COUNT II**
**Breach of Fiduciary Duty**
**(Derivatively Against the Officer Defendants)**

113. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

114. The Officer Defendants are executive officers of the Company. As executive officers, the Officer Defendants owed and owe the Company the highest obligations of loyalty, good faith, due care, oversight, and candor.

115. The Officer Defendants breached their fiduciary duties owed to Molina by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, failing to disclose: (1) material, adverse facts concerning the Company's "medical cost trend assumptions; (2) that Molina was experiencing a "dislocation between premium rates and medical cost trends; (3) that Molina's near-term growth was dependent on lack of "utilization of behavioral, health, pharmacy, and inpatient and outpatient services; (4) that as a result of the foregoing, Molina's financial guidance for fiscal year 2025 was likely to be cut; and therefore, (5) the Company's positive statements about its business, operations and prospects were materially misleading and/or lacked reasonable basis.. The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

116. As a direct and proximate result of the breaches of duty alleged herein, Molina has sustained and will sustain significant damages.

117. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

118. Plaintiff, on behalf of Molina, has no adequate remedy at law.

**COUNT III**
**Gross Mismanagement**
**(Against All Defendants)**

119. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

120. By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation

121. As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages.

122. As a direct and proximate result of the gross mismanagement and breaches of duty alleged herein, Molina has sustained and will sustain significant damages.

123. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

124. Plaintiff, on behalf of Molina, has no adequate remedy at law.

## COUNT IV
## Waste of Corporate Assets
## (Derivatively Against All Defendants)

125. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

126. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Time Period. It resulted in continuous, connected, and ongoing harm to the Company.

127. As a result of the misconduct described above, the Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain

officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

128. As a direct and proximate result of the waste of corporate assets and breaches of duty alleged herein, Molina has sustained significant damages.

129. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

130. Plaintiff, on behalf of Molina, has no adequate remedy at law.

**COUNT V**
**Unjust Enrichment**
**(Derivatively Against the Officer Defendants)**

131. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

132. By their wrongful acts, violations of law, and false or misleading statements or omissions of material fact that they caused to be made, the Officer Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

133. The Officer Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price, or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

134. Plaintiff, on behalf of Molina, seeks restitution from the Officer Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Officer Defendants due to their wrongful conduct and breach of their fiduciary duties.

**COUNT VI**
**Violation of Section 14(a) of the Exchange Act**

**(Against The Director Defendants)**

135. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

136. The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

137. The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the Proxy. In the Proxy, the Board solicited stockholder votes to reelect or elect the Director Defendants to the Board.

138. The Proxy, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Molina misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect or elect the Director Defendants.

139. Plaintiff, on behalf of Molina, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxy in connection with the improper reelection and election of the Director Defendants to the Board.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of

Molina and that Plaintiff is a proper and adequate representative of the Company;

B. Against all of the Defendants and in favor of Molina for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C. Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D. Awarding Molina restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: 6/1/2026 By: /s/ Francis J. "Casey" Flynn, Jr.

Francis J. "Casey" Flynn, Jr., #304712
**LAW OFFICE OF FRANCIS J. FLYNN, JR.**
5067 Metropolitan Plz
Los Angeles, CA 90036
Tele: 314-662-2836
Email: casey@lawofficeflynn.com

**ROWLEY LAW PLLC**
Shane T. Rowley, Esq. (to seek admission *pro hac vice*)
Danielle Rowland Lindahl, Esq. (to seek admission *pro hac vice*)
50 Main Street, Suite 1000
White Plains, New York 10606

Tel: (914) 400-1920
Fax: (914) 301-3514
Email: srowley@rowleylawpllc.com
drl@rowleylawpllc.com

**COUNSEL FOR PLAINTIFFS**